By the Court, Cowen, J.
The relator admitted that h^had, in form, duly enlisted into the army of the United States; but claimed that he was entitled to a discharge because he was an alien.
*18 Doubtless the commissioner erred in holding that the relator was a competent witness ; but no provision has been made by statute for reviewing on certiorari the evidence itself, or any decision concerning its competency.
To warrant a reversal, there must appear to have been either a want of jurisdiction below, or error in holding the alleged ground of discharge to have been sufficient. This ground being matter of allegation against the return to the habeas corpus, and so in the nature of an ordinary replication, it may be treated by us as a part of the record which it was the duty of the commissioner to make up. He has accordingly stated alienism as the ground on which his order of discharge was made. This appearing, as wé think properly, on the face of the order, the main question intended to be raised is before us in a proper way.
It is contended, in the first place, that Wyngall was properly discharged, because no statute expressly confers power upon recruiting officers to enlist aliens. This argument proves too much. To allow it, would be to decide that few if any of our enlistments are authorized by law. There is perhaps no statute expressly conferring authority upon any particular person to enlist troops of any kind. At all events, there was no need of such a statute. The authority is inherent in the national sovereignty, which, in the exercise of another inherent right, had already delegated the authority to the President. The statutes concerning the military forces of the United States, therefore, have generally assumed that the President, as the commander-in-chief and executive officer of the government, possesses the constitutional power to levy troops and fill up the ranks of the army, provided for by law in general terms, with such men as he shall think proper, unless restricted by special provision. There can be no doubt that a statute, by simply fixing the war or peace establishment of the nation, would, with&ut any thing more, confer authority upon the President to receive into the service such persons as do not labor under any personal disability to make the contract of enlistment. The same remark applies to all the proper military agents of the *19 government acting under the control of the President—commissioned officers, for instance, engaged in recruiting, mustering and coimnandmg troops. When a statute directs that a measure shall he taken, it must be understood as referring its execution to the proper existing agents, and to annex, by implication, all the ordinary means for carrying the measure into effect. It lies with the counsel for the soldier, therefore, to show that some statute or some principle has made aliens an exception from the number of those who can be enlisted into our armies. The counsel thinks he has found such an exception in the 11th and 12th sections of the act of March 16, 1802. (3 Bioren, 450.) That statute, after fixing the peace establishment at three regiments, prescribing the number of officers and privates, providing for pay, rations, clothing, &c., and after giving certain directions to the President as to discharging, retaining and arranging the officers and troops already in the service, conformably to the reduced limit of the establishment, and declaring that the whole corps shall be governed by the rules and articles of war, enacts (§ 11,) “ that the commissioned officers who shall be employed in the recruiting service to keep up by voluntary enlistment the corps as aforesaid, shall be entitled to receive for every effective able bodied citizen of the United States, who shall be duly enlisted by him for the term of five years, and mustered, of at least five feet six inches high, and between the ages of eighteen and thirty-five years, the sum of two dollars.” There is then a provision that this regulation shall not extend to soldiers re-enlisting; and that minors shall not be enlisted without the consent of their parents, guardians or masters respectively, if they have any. Enlisting any person contrary to the true intent and meaning of the act, is called an offence, and the amount of the bomity and clothing of the unsuitable recruit is to be forfeited and deducted from the officer’s pay and emoluments. The 12th section declares, that “ there shall be allowed and paid to each effective, able bodied citizen, recruited as aforesaid to serve for the term of five years, a bounty of twelve dollars.” The 5th section of the act of March 2,1833, (8 Bioren, 813,814,) repeals the premium to officers for enlisting recruits, and takes *20 away the bounty; but it cannot perhaps be relied on as affecting the previous directions concerning their personal qualities.
These sections are admitted to contain the only express enactments now existing, in any manner restricting enlistments to citizens of the United States. It is further conceded that the secretary of Avar, in his instructions to recruiting officers, has mentioned the quality of citizenship as a material requisite.
The Avords relied on as a limitation of power, taken according to their literal meaning, do not forbid the enlistment of aliens, or any other person; but only declare that, for every citizen, &c., so much shall be allowed as a premium, and so much paid for bounty. The power given by the Avhole statute then, read in this Avay and in reference to the general poAver of the President, is, to hire such soldiers as he or his recruiting officers may think proper, Avithout any particular regard to strength, citizenship or size; provided that, if the prescriptions of the statute be departed from, neither premium nor bounty shall be allowed-. It merely intimates a preference of the citizen to the foreigner. No doubt it has properly been considered by the war department as containing directions Avhich should be followed, so far as may be practicable. But giving to it the greatest possible effect, it is plain that all the restrictions are for the benefit of the government, not the recruit; and if a departure do not contravene some general principle of public policy, the question would seem to lie entirely Avith the government, ’whether it will forego the requisites wanted by its new recruit, or dismiss him. Quilibet potest renunciare juri pro se introducto. An officer, for instance, engaged in the recruiting service, chooses to enlist a man over the age of thirty-five, or less than five feet and six inches in height. He is mustered, and the proper agents of the government insist on holding him to his contract. There is nothing either in the words or intent of the statute entitling the recruit to avoid his bargain because he fails in those qualities which the government Avould have preferred. It may punish the officer for his carelessness or delinquency; but, on the statute, no other consequence would follow. I entirely agree, that, if'the part of the statute which mentions the personal qualities *21 of the recruit were the sole foundation of the power, the existence of those qualities would then be a condition, and, in then-absence, the enlistment would be void. I entertain no doubt, hoAvever, that it is a statute at most of restrictory direction as to the exercise of poAvers before conferred. The circular from the secretary of Avar cannot narrow those poAvers; nor is it pretended that his instructions must be looked to as the foundation of them. Both the statute and the circular must be understood to say in effect, “ Enlist such recruits as you shall deem suitable; but if you disregard certain requisites, you shall lose the premium, and be considered open to the censures of your department.”
The distinction betAveen the consequence of violating a statute Avhich prescribes certain requisites essential to the validity of an act, and a statute directory only, is entirely familiar. In the former case the act is void; in the latter it is valid, and if it relate to a contract, it is binding on both parties. The consequence therefore is, if we are right in considering the 11th and 12th sections directory only, that the enlistment in question is binding both on the government and the soldier. The case of Rex v. Birmingham, (2 Man. & Ryl., 230, 8 Barn, & Cr. 29, S. C.) is full to the point. (See also Dwar. on Stat. 715.) But suppose that the immediate agent making a contract with another, Avants authority; that does not preclude those who have it from adopting the contract and insisting on performance. Though the recruiting‘officer might have been forbidden by the statute, and so incapable of contracting, the recruit Avas mustered and received as a proper man into the service, and detained till wrested from his captain by the habeas corpus. The government resisted his discharge, and have brought a certiorari to test its validity. May Ave not apply to such a transaction the maxim, omnis ratiíiabitio retrotrahitur, et mandato priori mquiparaturi “ If I malee a contract in the name of a person who has not given me an authority, he Avill be under no obligation to ratify it, nor will he be bound to the performance of it. But if, with full knowledge of what I have done, he ratify the act, he will be considered to have contracted originally by my *22 agency; for the ratification is equivalent to an original authority.” (1 Liverm. on Agency, 44.)
But it is said that the statute is declaratory of a rule of general policy, a departure from which is contra bonos mores ; and that the law withholds its aid from a party who claims to enforce an immoral or illegal contract. The word offence is indeed used in the statute; and perhaps was meant to characterize the act of enlisting an alien, as well as a minor without the consent of his guardian. Neither act, however, would he indictable; and the only consequence, as we have seen, is a deduction from the officer’s pay. It becomes a mere matter of account between him and the government. The word offence seems to be used as importing no more than a departure from the direction given. The officer has offended against the direction of the statute, and thus failed to earn the premium and his full pay. The misfeasance is not, therefore, malum prohibitum, within the rule relied upon. We say in the same sense, an agent offends against the instructions of his “principal; a servant against those of his master. The word is used in a civil sense, and the act is followed by civil consequences only.
It is supposed, however, that, independently of the statute, there is such an unfitness in an alien enlisting in our army, thus obliging himself to fight perhaps against his own country, that the act is criminal by the law of nations. We were not referred to any publicist who has advanced such an opinion, nor are we aware of any. There is nothing in the law of nations which denies to a subject the right of expatriation. On the contrary, the right is asserted by all ap proved writers on that law; sometimes, indeed, under qualifica tions, but every man must, in effect, be his own judge whether he will continue subject to the government under which he was born, or transfer his allegiance to another. Hardly any nation in the civilized world whose subject has expatriated himself, would, at this day, claim to treat him, even in time of war with his adoptive country, as still bound by his original obligations. 1 speak not of the common law, nor of any that is merely local to the country of his first residence, but of the rules which govern the intercourse of nations in their corporate capacity. (See Vat *23 tel, B. 1, chap. 19, § 220 to 226. Du Ponceau's Bynkershoek, chap. 22, p. 175.) Emigration, enlistment, and taking the soldier’s oath, is effectually a change of allegiance. Though it do not confer all the rights of citizenship, it is a naturalization quoad hoc; and if the expatriation he bona fide, there is nothing contrary either to law or morals in the soldier fighting against his original country, should a war break out between that and the one into whose service he has chosen to enter. Being domiciled in the latter for any purpose, his native country would not, in time of war, discriminate between him and his neighbors. The person and effects of each would be alike exposed to the violence and ravages of the conflict; and both would be equally entitled to defence and protection from his adoptive country. "Who would deny that, under such circumstances, he might properly render assistance of any kind toward the common defence?
But whether he may resist his own country or not,. he may enlist in a foreign service, binding himself in general terms and acting accordingly, so long as his country is at peace with the state to which he engages himself. The right to do so much, even without an intent to transfer his allegiance, has always been recognized in practice, and forms a familiar head in the works of publicists. Vattel pronounces it to be always lawful, many times laudable; and he defines the obligations which spring out of the relation thus created. (Vattel, book 3, chap. 2, § 13, 14.) Bynkershoek maintains that you may enlist aliens even in the territory of their sovereign, if hé be in amity with you. (Du Ponceau's Bynkershoek, chap. 22, p. 174.) Any one in the least conversant with European history, will recollect numerous illustrations of this doctrine. I speak not of auxiliary forces furnished by one nation to another; but of individuals or associations bargaining away their services to a foreign prince. In proportion as the system of feudal militia gave way to that of disciplined troops, aims became a regular profession, and the trade of the mercenary soldier as common as any other. He claimed the right to carry on his trade not only at home, but in whatever country would give the best price for his bravery and skill, and his claim was allowed. *24 The Condottieri of the 15th and 16th centuries were constantly in the market with bands of trained soldiers. Venice, and I do not know but some other Italian states, relied on them as their sole resource in all then- military enterprises. Of a somewhat similar character was the traffic carried on for several centuries by the small cantons of Switzerland and the petty princes of Germany. Davila relates that when D’Onaw, in 1587, invited by Henry of Navarre, was about entering France at the head of the Reiters, Rodolph II sent him orders to disband. But he answered that the German nation had always enjoyed the liberty of entering themselves into pay under whom they pleased, so that it were not against the emperor. To this, Rodolph made no reply, though he was in friendship with the league, the forces of which were then led by the French king, against whom Henry was technically a rebel. (Davila, Book 8.) Clarendon mentions, that in the time of the English commonwealth, no less than 40,000 Irish mercenaries hired themselves into the armies of France and Spain. During the whole course of the religious wars in Europe, both volunteers and mercenaries took sides more according to the ecclesiastical than the civil divisions to which they attached themselves. The inevitable consequence was, that people of the same country were often fomid fighting against each other; and sometimes the subject against his prince. Yet the legality of the practice has seldom been questioned either in ancient or modern times, whatever casuists may have thought or written on the subject. “ If it be lawful for a subject to pass into the dominion of another prince, Says Bynker shook, {chap. 22,) “ it must be so for him to seek the means of acquiring an honest livelihood; and why may he not do it by entering into the land and sea service 1 In the United Provinces there is no law against it; and many Dutchmen, formerly, as well as in my own recollection, have served other sovereigns by sea as well as by land.” He adds, “ where it is lawful to let out to hire, it is lawful also to hire; and why should it not be equally so to contract for the hiring of soldiers in the territory of a friend, as to make any other contract and carry on any other kind of trade 1” To the objection that the *25 soldiers thus hired may possibly he employed against their own sovereign, he answers, “We are only to attend to the state of our country at the time; and ought not to look so far into futurity. Nor do I see any difference between enlisting men, and purchasing gun-powder, ammunition, arms and warlike stores.” Who ever questioned the right of the Russian emperor, and even the emperor of Turkey, to employ our citizens in building or commanding their ships of war? The principle contended for would criminate the La Fayettes and Steubens of our own revolution. Some nations, feeling the danger of becoming enfeebled by a long peace, have deemed it highly politic to encourage the enlistment of their citizens in distant armies, with a view to their education for military service in their own. Cromwell connived at and even openly encouraged the enlistment of Irish catholics into the armies on the continent, with a view to rid himself of their rebellious opposition at home. England has long had statutes declaring that foreigners enlisting into her sea or land armaments, and serving there for a certain length of time, shall be ipso facto naturalized. (See 13 George 2, chap. 3; and 2 George 3, chap. 25; 1 Burge’s Com. on Colonial and Foreign Law, 713.) Burge mentions a similar regulation as once existing in France. (Id. 702.) None of our own numerous acts concerning the army, previous to that of 1802, contain an intimation, as I can discover, that the recruiting service should be restricted to the enlistment of citizens; nor is it believed that previous to this time, a doubt of the legal right to enlist foreigners was entertained by any one qualified to pronounce upon the question. The designation in the act of 1802, was adopted by reference in the act of April 12,1808, § 5. (4 Bioren, 163.) The statute of January 11, 1812, under which the army was levied with a view to the war soon after declared against England, gave a bounty for enlisting any effective able-bodied man of a certain age, without regard to his citizenship. (Nee §§ 11 and 12, 4 Bioren, 369.) Several other statutes for enlarging the army, passed during the war, contain a like designation. (See acts of Jan. 20th, 1813, § 5; of Jan. 29th, 1813, § 7; of Dea 14th, 1814, § 1; 4 Bioren, 488, 492, 719.) At the close of *26 the war, the president was authorized to reduce the peace establishment to ten thousand men. (4 Bioren, 825, act of March 3, 1815.) The army to be reduced had been enlisted pursuant to different statutes, several of which had most clearly authorized the reception of foreigners. Under such statutes no doubt the greater number of our troops serving in 1815 had been levied. Among these there must have been some aliens; yet the statute then fixing the establishment, contained no direction that the president should distinguish between them and others, in the persons to be retained. Nor do our various statutes concerning re-enlistments, contain any such distinction.
On the whole, looting at the case independently of all statute restriction, and referring the question to international law, the validity of WyngalPs contract is clear of all doubt.
There is some difficulty, arising from much indirect and obscure legislation bordering on the point, in seeing whether the designation of citizenship in the act of 1802 be continued in our existing statutes or not. I have preferred considering the case on the assumption that it is. Being of opinion, however, that, at most, the statute is but directory in this, as it clearly is in regard to the other qualifications of the recruit, it follows that Wyngall can with no more reason object his alienism as a ground for annulling his contract with the United States, than could he, if a natural born subject, his feebleness of body. The prohibition against enlisting the feeble bodied man and the alien, is contained in the same clause, and expressed in the same form; and the consequence of each is declared to be the same. The objection that he fell below the ordinary standard in physical strength, would be looked upon as a very idle one; but it is not more so than any other claiming that the soldier is entitled to a discharge because the nation with which he dealt got the worst of the bargain.
Even were the soldier successful in combatting the position that the statute is directory, and in throwing his case upon the absence of power in the immediate agent, it is still difficult to see how he can allege the nullity of his contract against the confirmation of it by the commander-in-chief.
*27 We entertain no serious doubt that the commissioner erred; and his order discharging Wyngall must therefore be vacated.
Ordered accordingly.(a)

 Decisions of a similar character have been made, it is said, in the courts of other states, but I can find no report of them. A contrary decision was made by the recorder of Buffalo, in 1843, whose opinion, together with a letter from Conk-ling J. to the same effect, will be found reported in The New-York Legal Oh-server, p. 340.